Samuel H. Rudman
Erin W. Boardman
ROBBINS GELLER RUDMAN
& DOWD LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

*Lead Counsel for Plaintiff*

James E. Cecchi
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

*Liaison Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| WILLIAM T. HOEY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>INSMED INCORPORATED, WILLIAM H. LEWIS and ANDREW T. DRECHSLER,<br><br>Defendants. | Civil Action No. 3:16-cv-04323-FLW-TJB<br><br>**AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |

Lead Plaintiff Bucks County Employees Retirement Fund, ("Lead Plaintiff" or "Plaintiff"), by its undersigned attorneys, makes the allegations set forth herein based upon knowledge as to its own acts and upon the investigation conducted by Plaintiff's counsel. That investigation included the examination and analysis of information obtained from public and proprietary sources – including, *inter alia*, United States Securities and Exchange Commission ("SEC") filings by Insmed Incorporated ("Insmed" or the "Company"), regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and other publicly-available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of purchasers of: (i) the common stock of Insmed between March 26, 2014 and June 8, 2016, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; and (ii) Insmed common stock pursuant and/or traceable to the Company's public offering conducted on or about March 31, 2015 (the "Secondary Offering"), seeking to pursue remedies under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act").

2. Defendant Insmed is a development-stage biopharmaceutical company focused on developing and commercializing inhaled therapies for patients with serious lung diseases. The Company's leading product candidate is ARIKAYCE, a liposomal formulation of the antibiotic amikacin, for inhalation. During the Class Period, ARIKAYCE was in clinical development for the

treatment of nontuberculous mycobacteria ("NTM") lung disease, a rare and often chronic infection for which there is currently no approved treatment.

3. In order to begin generating revenues and eventually become profitable, Insmed planned to initially secure approval of ARIKAYCE by the European Medicines Agency (the "EMA") and commercialize the drug in Europe, before seeking approval by the U.S. Food and Drug Administration ("FDA").

4. At the start of the Class Period, on March 26, 2014, Insmed announced the results of its Phase 2 clinical trial in NTM patients (the "Phase 2 NTM Trial"). Defendants characterized the results of the Phase 2 NTM Trial as extremely promising, "with 11 out of 44 patients treated with ARIKAYCE" achieving "culture conversion" – *i.e.*, testing negative for mycobacteria – compared to just "3 out of 45 patients" in the placebo group. Shortly thereafter, Defendants fuelled investor optimism by announcing that Insmed planned to file a Marketing Authorization Application ("MAA") with the EMA, seeking approval of ARIKAYCE based upon the Phase 2 NTM Trial.

5. Unbeknownst to investors, as detailed herein, Insmed's Phase 2 NTM Trial was fundamentally flawed, in both design and execution, failed to demonstrate the efficacy of ARIKAYCE, and raised serious concerns about the drug's safety – and thus was highly unlikely to support the approval of ARIKAYCE.

6. Among the design flaws with the Phase 2 NTM Trial was the fact that Insmed was utilizing an unreasonably expansive definition of "culture conversion" – a negative test for mycobacteria at a single point in time – and the Company's tally of patients who had purportedly achieved culture conversion during the Phase 2 NTM Trial included patients who tested negative at the start of the trial. Although Insmed reported that patients receiving ARIKAYCE during the Phase

2 NTM trial had shown a culture conversion rate of approximately 30%, the true rate of culture conversion was just 8.5%.

7. By no later than August 6, 2015, the EMA submitted a "Major Objection" to Insmed concerning the Phase 2 NTM Trial, which outlined the problems with the trial's design and execution, drug product quality issues, safety concerns, and the trial's failure to demonstrate ARIKAYCE's efficacy. The EMA further informed Insmed that the Company's definition of "culture conversion" was inappropriate, and that "***sustained***" culture conversion – "which should be determined when at least ***3 months*** have elapsed after stopping all . . . treatment" – "should be the primary endpoint in any study intended to support approval for treatment of NTM."[1]

8. Defendants concealed both the problems with the Phase 2 NTM Trial and the EMA's objections to the trial from investors during the Class Period, and instead represented that the "data . . . shows the drug is safe and effective" and the trial had "not unearthed anything that is of material concern," and characterized the EMA as "excit[ed]" and "enthusiastic" about the results of the trial.

9. Even after receiving the EMA's objections to the Phase 2 NTM Trial, Defendants told investors that Insmed was "well prepared to respond" to the EMA's questions about the trial, and that there was "nothing . . . contained within the questions that was a surprise for us." Defendants also represented that Insmed had sought additional time to respond to the EMA in order to "include some . . . interesting follow-up data" from the trial. In truth, Insmed needed additional time to respond to the EMA because the Company was scrambling to salvage the Phase 2 NTM Trial, including by conducting a *post-hoc* analysis of the data utilizing a revised definition of culture conversion, defined as negative cultures at three consecutive points in time – a definition which still did not meet the EMA's stated criteria.

---

[1] All emphasis is added unless otherwise noted.

10. On June 8, 2016, after the close of the market, Insmed stunned investors by announcing that it had "withdrawn its . . . [MAA] from the . . . [EMA] for ARIKAYCE™ for the treatment of . . . [NTM] lung disease," after the EMA had "indicated that the phase 2 study did not provide a sufficient amount of evidence to support an approval." After investors reacted to this news, the price of Insmed common stock closed at $11.02 per share on June 9, 2016 – a decline of 60% from the stock's Class Period high.

11. The problems with the Phase 2 NTM Trial finally came to light after the end of the Class Period, when the EMA published a "Withdrawal Assessment Report" discussing the reasons for its decision not to recommend approval of ARIKAYCE.

**JURISDICTION AND VENUE**

12. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5] and Sections 11 and 15 of the Securities Act [15 U.S.C. §§77k and 77o].

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 27 of the Exchange Act [15 U.S.C. §78aa] and Section 22 of the Securities Act [15 U.S.C. §77v].

14. Venue is proper in this District pursuant to Section 27 of the Exchange Act, Section 22 of the Securities Act and 28 U.S.C. §1391(b) and (c). Insmed is headquartered in this District and many of the acts that constitute the alleged violations of law occurred in this District.

15. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16. Lead Plaintiff Bucks County Employees Retirement Fund purchased Insmed common stock during the Class Period and in the Secondary Offering, as set forth in the certification previously filed with the Court and incorporated herein by reference, and has been damaged thereby.

17. Defendant Insmed was incorporated in Virginia in 1999 and merged with Transave, Inc. ("Transave"), a New Jersey-based pharmaceutical company, in 2010. The Company's current operations are based on the technology and product candidates historically developed by Transave. Insmed's principal executive offices are located at 10 Finderne Avenue, Building 10, Bridgewater, New Jersey 08807. The Company's common stock is listed and trades on the NASDAQ, an efficient market, under the ticker symbol "INSM."

18. Defendant William H. Lewis ("Lewis") is, and was at all relevant times, Insmed's Chief Executive Officer ("CEO"), President, and a Director, having assumed those positions upon joining the Company on September 10, 2012.

19. Defendant Andrew T. Drechsler ("Drechsler") is, and was at all relevant times, Insmed's Chief Financial Officer ("CFO"), having assumed that position upon joining the Company on November 7, 2012. On November 3, 2016, Insmed announced that Drechsler was resigning from the Company, effective March 31, 2017.

20. Defendants Lewis and Drechsler are collectively referred to herein as the "Individual Defendants."

21. (a) Defendant Donald Hayden, Jr. was, at all relevant times, Chairman of the Board of Directors of Insmed.

(b) Defendant Alfred F. Altomari was, at all relevant times, a director of Insmed.

(c) Defendant Steinar J. Engelsen, M.D. was, at all relevant times, a director of Insmed.

(d) Defendant David W. J. McGirr was, at all relevant times, a director of Insmed.

(e) Defendant Melvin Sharoky, M.D. was, at all relevant times, a director of Insmed.

(f) Defendant Randall W. Whitcomb, M.D. was, at all relevant times, a director of Insmed.

22. Each of the defendants identified in ¶21(a)-(f) above signed the Registration Statement, as defined herein, in connection with the Secondary Offering. The defendants identified in ¶21(a)-(f) above, together with Defendants Lewis and Drechsler (who likewise signed the Registration Statement) are collectively referred to herein as the "Individual Securities Act Defendants."

23. Defendants Citigroup Global Markets Inc., Leerink Partners LLC, JMP Securities LLC and H.C. Wainwright & Co., LLC are investment banks that served as underwriters for the Secondary Offering, helping to draft and disseminate the Registration Statement, Prospectus and Prospectus Supplements (collectively, the "Registration Statement") and sharing more than $14 million in underwriting fees.

24. The defendants identified in ¶23 above are collectively referred to herein as the "Underwriter Defendants." The Underwriter Defendants failed to perform adequate due diligence in connection with their roles as underwriters for the Secondary Offering and were negligent in failing to ensure that the Registration Statement, Prospectus and Prospectus Supplements were prepared properly and accurately. The Underwriter Defendants' failure to conduct adequate due diligence was a substantial factor leading to the harm complained of herein.

## CLASS ACTION ALLEGATIONS

25. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Insmed between March 26, 2014 and June 8, 2016, inclusive, and who were damaged thereby, seeking to pursue remedies under the Exchange Act, as well as on behalf of all those who purchased or otherwise acquired Insmed Common stock pursuant and/or traceable to the Secondary Offering, and were damaged thereby, seeking to pursue remedies under the Securities Act (the "Class"). Excluded from the Class are Defendants, members of the immediate families of each Defendant, the Company and its officers and directors at all relevant times, any entity in which any excluded party has or had a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, heirs, successors or assigns of any such excluded party.

26. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Insmed common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands, of members in the proposed Class. In addition, the names and addresses of the Class members can be ascertained from records maintained by Insmed or its transfer agent. Notice of the pendency of this action can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

27. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class have been similarly affected by Defendants' conduct in violation of federal law that is

complained of herein. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

28. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

29. Common questions of law and fact apply equally to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether Defendants misrepresented and/or omitted material facts about Insmed and its business;

(c) whether the price of Insmed common stock was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the appropriate measure of damages.

30. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

31. Defendant Insmed is a biopharmaceutical company focused on the development and commercialization of inhaled therapies for patients with serious lung diseases.

32. During the Class Period, Insmed concentrated its efforts on the development and approval of ARIKAYCE for the treatment of NTM lung disease. NTM lung disease is a rare and often chronic infection that is capable of causing irreversible lung damage and can be fatal. There currently is no approved drug for the treatment of NTM lung disease in the U.S., Europe or Canada, and as a result, all drug treatments for NTM are used off-label.

33. NTM lung disease is classified as an "orphan" disease, meaning that it is rare and life-threatening or chronically debilitating. In the United States and Europe, companies who seek to develop drugs for the treatment of orphan diseases are eligible to receive an "orphan drug designation," which provides various incentives such as extended patent exclusivity. These incentives are intended to encourage the development of drugs which might otherwise lack a sufficient profit motive.

34. ARIKAYCE is an investigational drug consisting of the antibiotic amikacin administered via Insmed's proprietary liposomal[2] technology formulation. Amikacin is an established drug that is presently used as an off-label treatment for NTM. However, its use is limited by the need to administer it intravenously and by its toxicity to hearing, balance and kidney function.

35. By contrast, ARIKAYCE uses charge-neutral liposomes to deliver amikacin directly to the lung, where it is taken up by the lung macrophages where the NTM infection resides.

---

[2] Liposomes are microscopic membrane shells that contain water. In a liposome drug delivery system, water-soluble drugs, like amikacin, are located in the liposome's water core. The goal of a liposome delivery system is to deliver medicine directly to the site of the lung infection.

According to Insmed, this purportedly prolongs the release of amikacin in the lungs while offering the potential for decreased toxicity.

36. ARIKAYCE is administered once daily using a proprietary eFlow® nebulizer device manufactured by PARI Pharma GmbH.

37. As a development-stage biopharmaceutical company without any approved or marketed products, Insmed is not profitable and did not report any revenues or earnings during the Class Period. Accordingly, investors were keenly focused on the likelihood and timing of ARIKAYCE's approval – a necessary precursor to the drug's commercialization and Insmed's profitability.

38. During the Class Period, Insmed planned to initially secure approval of ARIKAYCE by the EMA and commercialize the drug in Europe, before seeking approval by the FDA and other regulatory authorities world-wide.

**Overview of Clinical Trials**

39. In order to secure approval of ARIKAYCE for the treatment of NTM, Insmed needed to conduct clinical trials. Clinical trials are typically conducted in three sequential phases.

40. Phase 1 trials involve the initial introduction of the drug into a small group of patients with the target disease to assess how the drug is metabolized, the drug's safety profile, and the safe dosage range. Phase 2 trials are designed to identify possible adverse effects and safety risks, to preliminarily evaluate the efficacy of the drug, and to assess dosage tolerance and optimal dosage on a medium-sized group of patients (roughly 30 to 300). Phase 3 trials expand the safety and efficacy assessment to a larger group of patients (generally 300 to 2,000) and typically take place over a longer period of time, in order to generate enough data to statistically evaluate the drug for potential

approval, to establish the overall benefit-risk relationship of the drug, and to provide adequate information for the labeling of the drug.

41. As set forth below, during the Class Period, Insmed sought approval of ARIKAYCE by the EMA based upon the Company's Phase 2 clinical trial in NTM patients.

**The Regulatory Approval Process**

42. In Europe, the EMA's centralized procedure for regulatory approval provides for the grant of a single marketing authorization that is valid for all European Union ("EU") member states. The approval process commences when an applicant submits a letter of intent to submit an MAA, typically at least seven months before submission of the MAA.

43. Upon submission, the MAA is evaluated by the EMA's Committee for Medicinal Products for Human Use ("CHMP") in order to determine whether the drug's quality, safety and efficacy have been sufficiently proven. The CHPM appoints "co-rapporteurs," representing two EU member states, to lead and coordinate the evaluation.

44. The CHMP is required to adopt an opinion on an MAA within 210 days, excluding clock stops when additional information is to be provided by the applicant in response to questions. On day 120 of the procedure, once the CHMP has received the preliminary assessment reports and opinions from the co-rapporteurs, it adopts a list of questions, which are sent to the applicant together with the CHMP's overall conclusions (the "Day 120 Questions"). The applicant then has three months to respond to the Day 120 Questions (and can request a three-month extension).

45. The co-rapporteurs then assess the applicant's responses to the Day 120 Questions, revise the assessment report as necessary and prepare a list of any outstanding issues. The revised assessment report and list of outstanding issues are sent to the applicant, together with the CHMP's recommendation, by day 180 of the procedure. The applicant then has one month to respond to the

CHMP (and can request a two-month extension). The co-rapporteurs assess the applicant's replies, submit them for discussion to the CHMP, and prepare a final assessment report. Once its scientific evaluation is completed, the CHMP issues a favorable or unfavorable opinion as to whether to grant the MAA.

**Insmed's Phase 2 Clinical Trial of ARIKAYCE in NTM Patients**

46. Insmed's Phase 2 NTM Trial was initiated on or about October 15, 2013. The Phase 2 NTM Trial was a randomized, double-blind, placebo-controlled clinical trial that compared once-daily ARIKAYCE (plus standard of care treatment) to a placebo (plus standard of care treatment) in 90 adult patients with treatment-resistant NTM lung disease. Eligibility for the study required patients to have been on guideline therapy for at least six months prior to screening and to continue to have persistently positive mycobacterial cultures.

47. The initial, double-blind phase of the trial lasted 84 days. After day 84, patients could elect to participate in the "open-label" phase of the trial, in which they would receive ARIKAYCE for an additional 84 days.

48. The "primary endpoint" – *i.e.*, the main, pre-determined objective – of the Phase 2 NTM Trial was a semi-quantitative measurement, on a seven-point scale, of the change in mycobacterial density from baseline (day one) to the end of the trial (day 84). Insmed also identified various "secondary" endpoints for the Phase 2 NTM Trial, including "culture conversion," defined as a patient testing negative for mycobacteria at a single point in time during the trial.

49. On March 26, 2014, the first day of the Class Period, Insmed announced the results of the Phase 2 NTM Trial and reported that ARIKAYCE had not met the trial's "pre-specified level for statistical significance" with respect to the primary endpoint of a favorable change in mycobacterial density on a seven-point scale. Insmed emphasized, however, that "***ARIKAYCE did achieve***

***statistical significance with regard to the clinically relevant key secondary endpoint of culture conversion***, with 11 out of 44 patients treated with ARIKAYCE . . . demonstrating negative cultures by day 84 of the study as compared to 3 out of 45 patients treated with placebo . . . ."

50. According to Insmed, "the study's primary endpoint was not culture conversion because it was assumed that culture conversion would not be achievable in 84 days treatment, particularly given the severe, treatment-resistant patient population that was the subject of this study."

51. Notwithstanding that the Phase 2 NTM Trial had missed its primary endpoint, on August 4, 2014, Insmed announced that the Company planned to file an MAA with the EMA for ARIKAYCE for the treatment of NTM lung infections in treatment-refractory (*i.e.*, resistant) patients, based upon Insmed's Phase 2 NTM Trial.[3] Two months later, on October 1, 2014, Insmed announced that its MAA would "include . . . all NTM patients, not simply the refractory patient population that was studied in the [Phase 2 NTM Trial]."

**The Phase 2 NTM Trial Was Fundamentally Flawed and Raised Serious Concerns About the Safety and Efficacy of ARIKAYCE**

52. Unbeknownst to investors, Insmed's Phase 2 NTM Trial was fundamentally flawed, in both design and execution, failed to demonstrate the efficacy of ARIKAYCE, and raised serious concerns about the drug's safety – and thus was highly unlikely to support the approval of ARIKAYCE.

[3] Insmed also announced that it would file an MAA for ARIKAYCE for the treatment of cystic fibrosis patients with Pseudomonas aeruginosa lung infections, based upon a recently-completed Phase 3 clinical trial that compared ARIKAYCE to TOBI®, an existing cystic fibrosis drug manufactured by Novartis Pharmaceuticals Corporation. However, Insmed abandoned pursuing its MAA for the treatment cystic fibrosis in August 2015, after the EMA requested that Insmed prove ARIKAYCE was not substantially similar to TOBI®.

**Design Flaws:**

53. According to the EMA, the design of the Phase 2 NTM Trial "was not discussed with EU Regulators until it was effectively completed and [the trial] was not planned *ab initio* to support [an] MAA."

54. Among the design flaws of the Phase 2 NTM Trial was its extremely short duration. Neither the Phase 2 NTM Trial, nor Insmed's prior clinical studies in cystic fibrosis patients, were of sufficient duration to provide meaningful data on ARIKAYCE's long-term safety and efficacy. Specifically, Insmed's MAA did not include data on patients dosed continuously for more than 168 days, even though ARIKAYCE was intended for long-term use, with treatment lasting until patients achieved 12 months of negative "sputum" (*i.e.*, lung secretion) cultures while on therapy.

55. According to the Withdrawal Assessment Report published by the EMA after the end of the Class Period:

> There was no justification for a comparison with placebo over only 84 days in [the Phase 2 NTM Trial]. There are no safety data for [ARIKAYCE] beyond 168 consecutive days and only 59 patients achieved this duration of exposure. The available data provide no useful basis for guiding physicians and it is not appropriate to ignore the fact that [Insmed] is promulgating continued use way beyond that supported by the safety database.

56. Additionally, in the Phase 2 NTM Trial, Insmed simply assumed that the same dose of ARIKAYCE used in cystic fibrosis patients should apply to patients with NTM, but on a daily rather than cyclical basis. Insmed did not provide any justification for this assumption, even though a different dose may have been appropriate due to differences in pathogens, sputum and type of lung damage. Indeed, the limited clinical data that was available indicated that ARIKAYCE was absorbed and metabolized differently in cystic fibrosis and NTM patients.

57. The Phase 2 NTM Trial did not follow up with patients for efficacy beyond 28 days post-treatment, and the patient follow-up visits at 12 months post-treatment only captured safety data.

58. Insmed's statistical analysis plan for the Phase 2 NTM Trial failed to specify how contaminated samples should be accounted for.

59. Moreover, the EMA found that there was no clinical basis for using Insmed's semi-quantitative, seven-point scale to measure the efficacy of ARIKAYCE. As the EMA bluntly stated in its Withdrawal Assessment Report, "this scale is of no known clinical importance."

60. The design flaws with Insmed's Phase 2 NTM Trial were so significant that the EMA submitted a Major Objection upon providing its Day 120 Questions to Insmed during the Summer of 2015. Summarizing the flaws with the Phase 2 NTM Trial's primary endpoint – as well as its purportedly-achieved secondary endpoint of culture conversion – the EMA stated:

> ***The only reliable way to assess the effect of treatment with [ARIKAYCE] is to document sustained [culture conversion] at a time point long after cessation of inhaled therapy. Sustained [culture conversion] should be the primary endpoint in any study intended to support approval for treatment of NTM. Sustained [culture conversion] was not a primary or secondary endpoint in [the Phase 2 NTM Trial]*** and no assessment of sputum culture was planned beyond 28 days post-study treatment. ***The secondary endpoint of conversion to negative culture was defined in the protocol as negativity at a single time point***.
>
> * * *
>
> Sputum culture conversion on treatment is not regarded as a reliable endpoint nor does it have any known predictive capacity for eradication of [mycobacteria] (i.e. to predict sustained negativity after stopping all treatment). [Insmed] is advised that the primary endpoint for any future EU submission should be ***sustained [culture conversion]***, which ***should be determined when at least 3 months have elapsed after stopping all*** . . . ***treatment***.

61. In response, Insmed revised its MAA to narrow the "proposed indication" for which it was seeking approval of ARIKAYCE, from all NTM patients, to adult NTM patients with

mycobacteria avium complex ("MAC") (a specific subset of NTM patients who had produced the most favorable data) "who have not achieved [culture conversion] after treatment with "first line therapy."

62. The fact that the EMA had lodged a Major Objection to the Phase 2 NTM Trial at Day 120 of the MAA process, as well as the fact that Insmed had dramatically narrowed the indication for which it was seeking approval of ARIKAYCE, relegating it to a second-line therapy in a limited subset of NTM patients, to be used after other treatments had failed – remained undisclosed to investors.

63. The Company also attempted to salvage the Phase 2 NTM Trial by turning it into what the EMA labelled a "hypothesis generating study," examining 47 MAC-positive patients in the trial utilizing a "*post hoc* definition of sputum culture conversion," defined as negative cultures at three consecutive points in time.[4] Nonetheless, the EMA determined that "the entire study was an hypothesis-generating Phase 2 study and [was] not of an appropriate design to be regarded as pivotal."

**Clinical Execution Problems:**

64. In addition to its significant design flaws, the Phase 2 NTM Trial also suffered from problems with clinical execution, which undermined the reliability of its results.

65. For example, Insmed reported data from 46 patients who attended the 12-month follow-up visit for the Phase 2 NTM Trial, but submitted a safety addendum indicating that 57 patients actually attended the 12-month follow-up visit and failed to explain the discrepancy.

[4] *Post-hoc* analyses, meaning those derived after the data has been unblinded, are less reliable than those designed prospectively for the simple reason that *post-hoc* analyses may be tailored to fit the data in order to generate whatever outcome is sought.

66. In the Phase 2 NTM Trial, amikacin sputum concentrations were measured as "µg/g" but the pharmacokinetics report incorrectly reported concentrations in "µg/mL." Insmed then assumed – without verifying – that 1 mL of sputum weighed 1 g.

67. As the EMA noted, "strange" results from a number of patients in the Phase 2 NTM Trial raised concerns "regarding sample mix-ups and the sensitivity of the laboratory culture methods." Specifically, five patients who received ARIKAYCE in the double-blind phase had negative cultures on day 1 of the trial, and one of those patients never had a positive culture at any visit. The other four each had a single visit with a positive culture, but had negative cultures at all other visits.

68. Significantly, the EMA found that residual amounts of amikacin in patients' sputum samples likely interfered with culture results in the Phase 2 NTM Trial, leading to false culture conversions. However, the EMA was unable to determine the extent to which this may have skewed the trial's efficacy findings.

**Drug Product Quality Issues:**

69. Additionally, the EMA raised a Major Objection regarding the drug product quality of ARIKAYCE, stating that "[t]he quality of Arikayce is currently unsatisfactory, which has unknown clinical implications."

**Safety Concerns:**

70. Not only was the Phase 2 NTM trial poorly designed and executed, but its results raised serious concerns about the safety of ARIKAYCE.

71. In evaluating the safety of ARIKAYCE, the EMA examined data from Insmed's Phase 2 NTM Trial, as well as data from the Company's six prior clinical trials in cystic fibrosis

patients. The EMA found that, in every study, ARIKAYCE was associated with higher rates of treatment-related adverse events and higher rates of discontinuation due to adverse events.

72. Furthermore, the data from Insmed's prior clinical trials in cystic fibrosis patients indicated that ARIKAYCE was associated with hearing loss.

73. During the double-blind phase of the Phase 2 NTM Trial:

- Seven ARIKAYCE patients discontinued due to adverse events, compared to zero in the placebo group.
- There were 32 protocol-defined pulmonary exacerbations in the ARIKAYCE group compared to 26 in the placebo group, with exacerbations occurring earlier in the ARIKAYCE group.
- There were 21 investigator-defined exacerbations in the ARIKAYCE group compared to 10 in the placebo group, with exacerbations occurring earlier in the ARIKAYCE group.
- There was a statistically significant difference for time to first use of any rescue drug, such that more ARIKAYCE than placebo patients required rescue drugs and required them earlier.
- A greater proportion of ARIKAYCE patients had treatment-emergent adverse events (72.7% vs. 37.8%).
- Serious adverse events were reported by a greater proportion in the ARIKAYCE group (18.2% vs. 8.9% placebo).

74. During the open-label phase of the Phase 2 NTM Trial, in which all patients received ARIKAYCE:

- Sixteen additional patients discontinued ARIKAYCE due to adverse events.
- Almost all patients had treatment-emergent adverse events, and the rate of adverse events was higher for those patients first exposed to ARIKAYCE in the open-label phase.
- Two patients (one in the double-blind phase and one in the placebo phase) experienced very similar "suspected unexpected serious adverse reactions." Both patients developed fever, aches and pains and increasing respiratory distress within the first 2 weeks after starting treatment with ARIKAYCE, and were found to have inflammation of the lungs' alveoli.

75. According to the EMA, these results "showed very clearly that treatment-emergent adverse events were much more common with ARIKAYCE" than with the empty liposomes administered to patients in the placebo group.

76. The EMA found that the higher rates of adverse events, exacerbations and study discontinuations among patients receiving ARIKAYCE indicated that "amikacin *per se* is an irritant within the airways."

**Lack of Efficacy:**

77. Despite Insmed's public statements emphasizing that its proprietary, liposomal formulation delivered amikacin directly to the site of the NTM lung infection – purportedly maximizing efficacy and minimizing toxicity – the EMA found that Insmed had not adequately studied or documented the possible advantages of using liposomal amikacin for inhalation, rather than inhaling the amikacin itself. As the EMA noted, amikacin is believed to leak out from liposomes, and clinical samples showed similar concentrations of amikacin in both delivery methods. Thus, "the evidence for a clinical benefit [to] providing amikacin in liposomes is somewhat weak."

78. In analyzing the results of the Phase 2 NTM Trial based upon Insmed's revised proposed indication and revised definition of culture conversion, the EMA rejected five patients who had negative cultures at day 1 of the trial, although Insmed had included them in its tally of patients who achieved culture conversion. The EMA reasoned that "it [was] not possible to conclude that these patients really had" achieved culture conversion while receiving ARIKAYCE.

79. Of the 47 patients for whom the EMA analyzed culture conversion data, just four patients had a confirmed culture conversion that persisted at the 12-month follow-up visit, yielding a

culture conversion rate of 8.5% – which the EMA found to be "the only reliable [culture conversion] rate."

80. As the EMA found, "if there is any efficacy at all, which remains to be proven, it is probably confined to a subset of non-[cystic fibrosis] and HIV uninfected patients with a low sputum burden of MAC at [day one of the trial]."

81. Particularly in light of "concern[s] that baseline imbalances in bacterial load and residual amikacin in sputum samples influenced the [culture conversion] rates," the EMA concluded that:

> ***There is insufficient evidence of efficacy in non-[cystic fibrosis] patients with MAC lung disease to be able to determine any beneficial effects [of ARIKAYCE]. It is not possible to draw any conclusions on the efficacy of [ARIKAYCE] in non-[cystic fibrosis] patients with MAC lung disease based on [the Phase 2 NTM Trial]***.

## SECURITIES ACT ALLEGATIONS

### The Secondary Offering

82. On or about May 30, 2014, Insmed filed the Registration Statement with the SEC. The Registration Statement was filed on Form S-3 and offered to sell, over time, common stock of the Company. Accordingly, the Secondary Offering was considered to be a "shelf registration" that allowed the Company to register securities for sale while leaving them on the "shelf" until it decided to conduct an offering, provided, however, that the Registration Statement met all the requirements proscribed under applicable securities regulations, including that the information contained therein be current.

83. Also on or about May 30, 2014, Insmed filed a Prospectus on Form 424B, which formed part of the Registration Statement for the Secondary Offering.

84. Subsequently, on March 30, 2015, Insmed issued a press release announcing a proposed secondary public offering of 10 million shares of the Company's common stock. Also on

or about March 30, 2015, Insmed filed a preliminary Prospectus Supplement for the Secondary Offering.

85. On or about March 31, 2015, Insmed filed an additional Prospectus Supplement, which, among other things, set the price of the Secondary Offering at $20.65 per share.

86. On April 6, 2015, Insmed issued a press release announcing the closing of the Secondary Offering, whereby 11.5 million shares had been sold to the public (after the underwriters exercised their over-allotment rights to purchase an additional 1.5 million shares) at $20.65 per share.

87. Insmed received approximately $223 million in net proceeds from the Secondary Offering. According to the Company, "Insmed intend[ed] to use the net proceeds from th[e] offering to fund further clinical development of ARIKAYCE™," among other things.

**The Registration Statement Contained Inaccurate Statements of Material Fact and Omitted Material Information**

88. The Registration Statement, which incorporated the Prospectus and the Prospectus Supplements, issued in connection with the Secondary Offering was negligently prepared and, as a result, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

89. In particular, the Registration Statement described the results of the Phase 2 NTM Trial, in pertinent part, as follows:

> In March 2014, we reported top-line clinical results from the double-blind portion of our phase 2 clinical trial in the United States (US) and Canada of ARIKAYCE in patients who had treatment-resistant lung infections caused by NTM.

* * *

> A secondary efficacy endpoint of the study was proportion of subjects with culture conversion to negative. ***ARIKAYCE achieved statistical significance with regard to this secondary endpoint, with 11 out of 44 patients treated with ARIKAYCE (added to standard of care treatment) demonstrating clearance of the infecting mycobacterial organism (culture negative) at day 84 of the study as compared to 3 out of 45 patients treated with placebo*** (added to standard of care treatment) (p=0.01).
>
> In May 2014, additional data from the open-label portion of the phase 2 trial were presented in a poster session at the American Thoracic Society meeting. At the conclusion of the 84-day double blind phase of the trial, 78 of the 80 patients completing the double-blind phase agreed to receive once-daily ARIKAYCE plus standard of care treatment for an additional 84 days. Data from 68 of these patients who completed the visits during the additional open label phase were available for inclusion in the poster. ***These results collected from the open label phase show that 21 of these patients were culture negative for NTM at Day 168. This data reflects 10 patients who were culture negative at Day 84 as well as 5 additional patients from the ARIKAYCE arm and 6 additional patients who were initially on placebo and switched to ARIKAYCE during the open-label phase***.

90. The statements referenced above in ¶89 were materially inaccurate because they misrepresented and failed to disclose that Insmed was utilizing an unreasonably expansive definition of "culture conversion" – a negative test at a single point in time during the Phase 2 NTM Trial – and the Company's tally of patients who had purportedly achieved "culture conversion" during the trial included patients who tested negative for mycobacteria at the start of the trial. Therefore, the true rate of culture conversion was significantly lower than "11 out of 44 patients treated with ARIKAYCE" during the double-blind phase of the trial and 21 out of 68 patients (approximately 30%) treated with ARIKAYCE at the conclusion of the open-label phase of the trial. As the EMA determined, the true rate of patients who had experienced culture conversion while receiving ARIKAYCE during the Phase 2 NTM Trial was just 8.5%. In addition, residual amounts of ARIKAYCE in patients' sputum samples likely interfered with culture results, leading to false culture conversions.

91. The Registration Statement incorporated by reference Insmed's annual report on Form 10-K for the year ended December 31, 2014, filed with the SEC on February 27, 2015 (the "2014 10-K"). With respect to the purported safety and efficacy of ARIKAYCE, the 2014 10-K stated, in pertinent part, as follows:

> ***We believe that ARIKAYCE may provide: (i) improved efficacy resulting from sustained deposition of drug in the lung and improved ability to reach the site of infection*** (. . . for NTM, this means enhanced uptake into macrophages, targeting NTM within these cells); [and] ***(ii) decreased adverse events and improved tolerability*** as compared with amikacin delivered intravenously . . . .

92. The statements referenced above in ¶91 were materially inaccurate because they misrepresented and failed to disclose that: (a) Insmed had not adequately studied or documented the possible advantages of using liposomal amikacin for inhalation (as opposed to inhaling the amikacin itself), and the clinical evidence supporting any advantage was weak; and (b) the Phase 2 NTM Trial, as well as Insmed's prior clinical trials of ARIKAYCE in cystic fibrosis patients, raised serious concerns about the safety of the drug and demonstrated that ARIKAYCE was an irritant within the airways.

93. In addition, the 2014 10-K represented that:

> ***All sites of manufacture of ARIKAYCE*** use the technology developed and optimized by us. We and all our manufacturing partners ***must comply with applicable regulations relating to the current good manufacturing practices (cGMP) regulations of regulatory agencies***. The cGMP regulations include requirements relating to the organization of personnel, buildings and facilities, equipment, control of components and drug product containers and closures, production and process controls, packaging and labeling controls, holding and distribution, laboratory controls, records and reports, and returned or salvaged products. ***We believe that all facilities will meet cGMP requirements for the sterile manufacturing of finished ARIKAYCE product***.

94. The statements referenced above in ¶93 were materially inaccurate because they misrepresented and failed to disclose that the product quality of ARIKAYCE was unsatisfactory, which had unknown clinical implications.

**Misleading Risk Disclosures:**

95. Pursuant to Item 3 of Form S-3, the Registration Statement was required to furnish information pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.503], including, among other things, a "discussion of the most significant factors that make the offering risky or speculative."

96. The Registration Statement represented that: "In the fourth quarter of 2014, we filed a MAA with the EMA for ARIKAYCE for the treatment of NTM lung infections . . . . The MAA for ARIKAYCE was validated in February 2015 . . . .," and included a "Risk Factor" stating that: "Our near term prospects are highly dependent on the success of our most advanced product candidate, ARIKAYCE. If we are unable to . . . obtain regulatory approval for . . . ARIKAYCE, our business and the value of our common stock may be materially adversely affected."

97. The purported risk disclosure set forth above in ¶96 was not meaningful because it failed to advise investors in the Secondary Offering of the following facts:

(a) the Phase 2 NTM Trial, upon which Insmed's MAA for ARIKAYCE was based, was deeply flawed in terms of both design and execution, failed to demonstrate the efficacy of ARIKAYCE, and raised serious concerns about the drug's safety – and thus was highly unlikely to support the approval of ARIKAYCE;

(b) the Phase 2 NTM Trial was not of sufficient duration to provide reliable data on the safety or efficacy of ARIKAYCE – particularly since ARIKAYCE was intended for long-term use;

(c) Insmed was utilizing an unreasonably expansive definition of "culture conversion" – a negative test at a single point in time during the Phase 2 NTM Trial – and the Company's tally of patients who had purportedly achieved "culture conversion" during the trial included patients who tested negative for mycobacteria at the start of the trial. Indeed, the true rate

of patients who had experienced culture conversion while receiving ARIKAYCE during the Phase 2 NTM Trial was just 8.5%;

(d) the Phase 2 NTM Trial suffered from execution problems which undermined the reliability of its results. Among other things, residual amounts of ARIKAYCE in patients' sputum samples likely interfered with culture results, leading to false culture conversions;

(e) the EMA was unlikely to approve ARIKAYCE because its product quality was unsatisfactory, which had unknown clinical implications;

(f) the Phase 2 NTM Trial, as well as Insmed's prior clinical trials of ARIKAYCE in cystic fibrosis patients, raised serious concerns about the safety of the drug and demonstrated that ARIKAYCE was an irritant within the airways; and

(g) Insmed had not adequately studied or documented the possible advantages of using liposomal amikacin for inhalation (as opposed to inhaling the amikacin itself), and the clinical evidence supporting any advantage was weak.

98. Accordingly, the Registration Statement negligently failed to disclose the most significant factors that made the Secondary Offering risky or speculative as required by Item 3 of Form S-3.

**COUNT I**

**Violation of Section 11 of the Securities Act**
**Against All Defendants**

99. Plaintiff incorporates herein ¶1 and ¶¶12-98 by reference.

100. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, against all Defendants. For purposes of this Count, Plaintiff affirmatively states that it does not claim that Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

101. This count is asserted by Plaintiff against all Defendants by, and on behalf of, persons who acquired the Company's common stock traceable to the Registration Statement issued in connection with the Secondary Offering.

102. The Registration Statement for the Secondary Offering was defective and inaccurate, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

103. The Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement.

104. Defendant Insmed is the registrant for the Secondary Offering. As such, Insmed is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

105. The Individual Securities Act Defendants each caused the issuance of the Registration Statement and/or signed the Registration Statement, either personally or through an Attorney-in-Fact. The Individual Securities Act Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements misleading. None of the Individual Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, were without omission of any material facts, and/or were not misleading.

106. The Underwriter Defendants were each underwriters, as that term is used in Section 11(a)(5) of the Securities Act, with respect to the Secondary Offering and the Company's common stock sold through the Registration Statement. The Underwriter Defendants were required to

investigate with due diligence the representations contained therein to confirm that they did not contain materially misleading statements or omit material facts. None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, were without omission of any material facts, and/or were not misleading.

107. Plaintiff purchased the Company's common stock in the Secondary Offering, or traceable thereto, in reliance upon the defective Registration Statement and without knowledge of the untruths and/or omissions alleged herein and has been damaged thereby.

108. By reasons of the conduct herein alleged, each Defendant named in this Count violated, and/or controlled a person who violated, Section 11 of the Securities Act.

109. This claim is brought within one year after the discovery of the untrue statements and omissions in the Registration Statement and within three years of the effective date of the Registration Statement.

**COUNT II**

**Violation of Section 12(a)(2) of the Securities Act**
**Against All Defendants**

110. Plaintiff incorporates herein ¶1 and ¶¶12-109 by reference.

111. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, against all Defendants. For purposes of this Count, Plaintiff affirmatively states that it does not claim that Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

112. Defendants issued, caused to be issued and/or signed the Registration Statement in connection with the Secondary Offering. The Registration Statement contained a Prospectus and

Prospectus Supplements which were used to induce investors, such as the Lead Plaintiff and the other members of the Class, to purchase Insmed common stock.

113. The Prospectus and Prospectus Supplements contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein. The Individual Securities Act Defendants' actions of solicitation to promote the Secondary Offering included the preparation of a defective and inaccurate Prospectus and Prospectus Supplements.

114. Defendant Insmed and the Underwriter Defendants, acting through their employees, agents and others, solicited such purchases for their personal financial gain through the preparation and/or dissemination of the Prospectus and Prospectus Supplements.

115. The Underwriter Defendants purchased at least 11.5 million shares of Insmed common stock at the public offering price, less an underwriting discount, in the Secondary Offering.

116. The Underwriter Defendants participated in the preparation and dissemination of the defective and inaccurate Prospectus and Prospectus Supplements for their own financial benefit. But for their participation in the Secondary Offering, including their solicitation as set forth herein, the Secondary Offering could not and would not have been accomplished. Specifically, the Underwriter Defendants:

(a) made the decision to conduct the Secondary Offering and do it at the price set forth in the offering documents. The Underwriter Defendants drafted, revised and/or approved the Prospectus and Prospectus Supplements. The Prospectus and Prospectus Supplements were calculated to create interest in Insmed common stock and were widely distributed by or on behalf of the Underwriter Defendants for that purpose;

(b) finalized the Prospectus and Prospectus Supplements and caused them to become effective; and

(c) conceived and planned the Secondary Offering and orchestrated all activities necessary to affect the sale of these securities to the investing public, by issuing securities, promoting the securities and supervising their distribution and ultimate sale to the investing public.

117. As set forth more specifically above, the Prospectus and Prospectus Supplements contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in light of circumstances in which they were made, not misleading.

118. Plaintiff and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Prospectus and Prospectus Supplements.

119. The Defendants named in this Count were obligated to make a reasonable and diligent investigation of the statements contained in the Prospectus and Prospectus Supplements to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus and Prospectus Supplements were accurate and complete in all material respects. Had they done so, these Defendants would have known of the material misstatements and omissions alleged herein.

120. By reason of the conduct alleged herein, these Defendants violated Section 12(a)(2) of the Securities Act. Accordingly, Lead Plaintiff and members of the Class who hold Insmed common stock that was purchased in the Secondary Offering have the right to rescind and recover the consideration paid for their Insmed common shares and hereby elect to rescind and tender their

Insmed common stock to the Defendants sued herein. Plaintiff and Class members who have sold their Insmed common stock are entitled to rescissory damages.

**COUNT III**

**Violation of Section 15 of the Securities Act Against the Individual Securities Act Defendants**

121. Plaintiff incorporates herein ¶1 and ¶¶12-120 by reference.

122. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against the Individual Securities Act Defendants. For purposes of this Count, Plaintiff affirmatively states that it does not claim that the Individual Securities Act Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

123. Each of the Individual Securities Act Defendants was a control person of Insmed by virtue of his or her position as a director and/or senior officer of Insmed. By reason of their senior management positions and/or directorships at the Company, as alleged above, the Individual Securities Act Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Insmed to engage in the conduct complained of herein. In addition, the Individual Securities Act Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Insmed. By reason of such conduct, the Individual Securities Act Defendants are liable pursuant to Section 15 of the Securities Act.

124. Each of the Individual Securities Act Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged in Count III above, based on their having signed the Registration Statement and/or having otherwise participated in the process which allowed the Offering to be successfully completed.

## EXCHANGE ACT ALLEGATIONS

125. For purposes of this section of the Complaint, "Defendants" refers only to Defendants Insmed, Lewis and Drechsler.

### Materially False and Misleading Statements Made During the Class Period

126. The Class Period begins on March 26, 2014. On that date, Insmed issued a press release announcing the results of the double-blind portion of the Phase 2 NTM trial. According to the press release, "ARIKAYCE did not meet the pre-specified level for statistical significance although there was a positive trend . . . in favor of ARIKAYCE. However, ***ARIKAYCE did achieve statistical significance with regard to the clinically relevant key secondary endpoint of culture conversion, with 11 out of 44 patients treated with ARIKAYCE*** . . . ***demonstrating negative cultures by day 84 of the study as compared to 3 out of 45 patients treated with placebo*** . . . ."

127. Defendant Lewis commented on the trial results, in pertinent part, as follows:

> While ARIKAYCE did not achieve statistical significance on the primary endpoint of bacterial density reduction, ***we are very pleased by the greater number of culture conversions among patients receiving ARIKAYCE. We now look forward to the regulatory discussions in*** the US and ***Europe that will guide our path forward***.

128. In addition, Dr. Renu Gupta, Insmed's Executive Vice President of Development and Chief Medical Officer stated, in pertinent part, as follows:

> ***We are encouraged by the achievement of culture conversion in this trial, which we believe is the ultimate goal in the treatment of mycobacterial infections***. The design of this trial was such that the patients who entered the trial and received [the] drug were clearly resistant to guideline therapy, making them the most treatment-challenged NTM patients. Therefore ***the hurdle for showing any improvement with a therapy is extremely high***.

129. The statements referenced above in ¶¶126-28 were materially false and misleading at the time they were made because they misrepresented and failed to disclose the following facts, which were known to Defendants or recklessly disregarded by them:

(a) the Phase 2 NTM Trial was deeply flawed in terms of both design and execution, failed to demonstrate the efficacy of ARIKAYCE, and raised serious concerns about the drug's safety – and thus was highly unlikely to support the approval of ARIKAYCE;

(b) the Phase 2 NTM Trial was not of sufficient duration to provide reliable data on the safety or efficacy of ARIKAYCE – particularly since ARIKAYCE was intended for long-term use;

(c) Insmed was utilizing an unreasonably expansive definition of "culture conversion" – a negative test at a single point in time during the Phase 2 NTM Trial – and the Company's tally of patients who had purportedly achieved "culture conversion" during the trial included patients who tested negative for mycobacteria at the start of the trial. Therefore, the true rate of culture conversion was significantly lower than "11 out of 44 patients treated with ARIKAYCE."

(d) the Phase 2 NTM Trial suffered from execution problems which undermined the reliability of its results. Among other things, residual amounts of ARIKAYCE in patients' sputum samples likely interfered with culture results, leading to false culture conversions;

(e) the Phase 2 NTM Trial, as well as Insmed's prior clinical trials of ARIKAYCE in cystic fibrosis patients, raised serious concerns about the safety of the drug and demonstrated that ARIKAYCE was an irritant within the airways;

(f) Insmed had not adequately studied or documented the possible advantages of using liposomal amikacin for inhalation (as opposed to inhaling the amikacin itself), and the clinical evidence supporting any advantage was weak; and

(g) as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about ARIKAYCE and the Phase 2 NTM Trial.

130. On May 20, 2014, Insmed issued a press release announcing "***[p]ositive [o]pen [l]abel [d]ata***" from the Company's Phase 2 NTM Trial, which examined 68 patients who "agreed to receive once-daily ARIKAYCE . . . for an additional 84 days" following the conclusion of the double-blind phase of the trial. According to the press release, "***21 of these patients were culture negative for NTM***" at the conclusion of the open-label phase, an "***increase[] from the double blind phase of the trial in which 11 out of 44 patients treated with ARIKAYCE***" and "3 out of 45 patients treated with . . . placebo" were culture negative at the end of the trial. Defendant Lewis commented on the study results, in pertinent part, as follows:

> ***We are encouraged by these additional and durable culture conversions which we believe is the ultimate goal in the treatment of NTM lung infections***.

131. The statements referenced above in ¶130 were materially false and misleading at the time they were made for the reasons set forth in ¶129. In addition, the statement referenced above in ¶130 that "21. . . patients were culture negative for NTM" at the conclusion of the open-label phase was materially false and misleading at the time it was made because the true rate of culture conversion was significantly lower than 21 out of 68 patients (approximately 30%). As the EMA determined, the true rate of patients who had experienced culture conversion while receiving ARIKAYCE during the Phase 2 NTM Trial was just 8.5%. Finally, the statement referenced above in ¶130 that Defendants were "encouraged by" the "durable culture conversions" was materially false and misleading at the time it was made because the Phase 2 NTM Trial was not designed to measure whether culture conversions were "durable," and instead defined culture conversion as a negative mycobacterial culture at a single point in time.

132. On August 4, 2014, Insmed issued a press release announcing that, "following discussions with European regulatory authorities, [Insmed] intends to file by the end of 2014 a Marketing Authorization Application (MAA) with the . . . [EMA] for ARIKAYCE™ . . . for the

treatment of . . . [NTM] lung infections in treatment refractory patients as well as for Pseudomonas aeruginosa lung infections in cystic fibrosis [] patients." Defendant Lewis commented on the planned MAA filing, in pertinent part, as follows:

> ***Our planned filing in Europe is a significant step forward in our goal to bring ARIKAYCE to market to benefit the thousands of European NTM patients refractory to standard therapy***, as well as cystic fibrosis patients with Pseudomonas aeruginosa lung infections.

133. In addition, Peggy Berry, Insmed's Vice President of Regulatory Affairs, commented on the EMA approval process, in pertinent part, as follows:

> ***We are moving forward purposefully to complete our MAA submission for ARIKAYCE by the end of the year*** . . . . ***We greatly appreciate the collaborative and supportive interactions we have had with the EMA and European agency reviewers providing clarity around their requirements to complete a timely review of ARIKAYCE***.

134. Later that day, Defendants held a conference call with analysts and investors, during which Defendant Lewis commented, in pertinent part, as follows:

> . . . ***I would like to start by expressing our appreciation for the constructive interactions we have had with both the EMA and the FDA throughout our various discussions and meetings***.
>
> * * *
>
> ***I am very pleased with the progress we have made, and I believe the path from here to filing and ultimately approval in both the EU and US is very clear***.
>
> * * *
>
> I would just like to add that ***the deeper we dive into the data, the more evident it is to us and to the clinicians that ARIKAYCE had a significant impact. We were able to share that data with the*** . . . ***EU and believe it was what gave rise to our receipt of*** . . . ***a green light to file from the EU***.
>
> * * *
>
> As we look out to the opportunity this therapy potentially represents, ***we are very excited about the data we have in hand*** and the potential for this therapy and ***above***

> ***all else we feel we have a partner in both the EU and US agencies that see the potential role for this therapy***.
>
> * * *
>
> ***We are pleased with the clinical data produced in the past year and with the regulatory clarity discussed today, as we are one step closer to realizing our goal of bringing this potentially important therapy to patients in need***.

135. Also during the call, Peggy Berry, Insmed's Vice President of Regulatory Affairs, commented on the EMA approval process, in pertinent part, as follows:

> . . . First, let me review our regulatory status in Europe where we plan to file a single MAA for both treatment refractory NTM lung disease and Pseudomonas aeruginosa lung infection in cystic fibrosis patients. As Will mentioned, ***we have had meetings with the EMA and the primary reviewers, [called co-rapporteurs] of our MAA. All of [the] agencies were enthusiastic about the initial look at the summary data for treatment refractory NTM patients and the possibility of providing a desperately needed treatment option for these patients. These positive interactions confirmed our strong inclination toward including NTM data in our initial MAA***.
>
> * * *
>
> ***The regulatory agency interactions have provided us with the clarity we need regarding their requirements to complete a timely review of ARIKAYCE, allowing us to make an [MAA] submission before the end of 2014*** . . . .

136. The statements referenced above in ¶¶132-35 were materially false and misleading at the time they were made because they misrepresented and failed to disclose the following facts, which were known to Defendants or recklessly disregarded by them:

(a) the Phase 2 NTM Trial, upon which Insmed's planned MAA for ARIKAYCE was based, was deeply flawed in terms of both design and execution, failed to demonstrate the efficacy of ARIKAYCE, and raised serious concerns about the drug's safety – and thus was highly unlikely to support the approval of ARIKAYCE;

(b) the Phase 2 NTM Trial was not of sufficient duration to provide reliable data on the safety or efficacy of ARIKAYCE – particularly since ARIKAYCE was intended for long-term use;

(c) Insmed was utilizing an unreasonably expansive definition of "culture conversion" – a negative test at a single point in time during the Phase 2 NTM Trial – and the Company's tally of patients who had purportedly achieved "culture conversion" during the trial included patients who tested negative for mycobacteria at the start of the trial. Indeed, the true rate of patients who had experienced culture conversion while receiving ARIKAYCE during the Phase 2 NTM Trial was just 8.5%;

(d) the Phase 2 NTM Trial suffered from execution problems which undermined the reliability of its results. Among other things, residual amounts of ARIKAYCE in patients' sputum samples likely interfered with culture results, leading to false culture conversions;

(e) the EMA was unlikely to approve ARIKAYCE because its product quality was unsatisfactory, which had unknown clinical implications;

(f) the Phase 2 NTM Trial, as well as Insmed's prior clinical trials of ARIKAYCE in cystic fibrosis patients, raised serious concerns about the safety of the drug and demonstrated that ARIKAYCE was an irritant within the airways; and

(g) Insmed had not adequately studied or documented the possible advantages of using liposomal amikacin for inhalation (as opposed to inhaling the amikacin itself), and the clinical evidence supporting any advantage was weak.

137. As a result of the foregoing, Defendants lacked a reasonable basis to characterize Insmed's interactions with the EMA as "collaborative," "supportive," and "constructive," to state that they were "pleased with" and "very excited about the data," from the Phase 2 NTM Trial, which

showed that "ARIKAYCE had a significant impact," or to describe "the path from here to filing and ultimate approval" as "very clear." In addition, the statement referenced above in ¶135 that the EMA was "enthusiastic about the initial look at the summary data" from the Phase 2 NTM trial was materially false and misleading at the time it was made because the EMA either was not enthusiastic about the flawed Phase 2 NTM Trial, or Insmed had misled the EMA about the trial's design, execution and results.

138. Reflecting Defendants' positive statements, a Leerink Partners analyst report dated August 4, 2014 stated that, according to Insmed, "the European regulators were enthusiastic in their initial look at the . . . [Phase 2 NTM Trial] data, as the EMA also believes that culture conversion is a clinically relevant measure for NTM treatment."

139. Similarly, a September 5, 2014 analyst report issued by Cowan and Company noted that "Insmed has indicated that they have had a number of conversations with EMA regulators (including both rapporteur countries) and [are] confident in the reviewability and approvability of Arikayce for NTM . . . ."

140. On October 1, 2014, Defendant Lewis spoke at the Leerink Rare Disease Roundtable and responded to an analyst's question concerning the regulatory approval process with the EMA, in pertinent part, as follows:

> Joe Schwartz – Leerink Partners – Analyst:
>
> ***How is the feedback that you have been able to get from the EMA so far***?
>
> Defendant Lewis:
>
> . . . I think it's important to remember that when Europe is looking at our submission they are looking at both the CF indication and the NTM indication. And I would say that the CF study, we have to remind everyone, was a phase 3 pan-European and Canadian 300-patient comparison against standard of care where we had the primary endpoint. So no ambiguity there.

> ***And having that in our pocket alongside the NTM data put us in a very good position to have productive discussions with the co-rapporteurs, which are Poland and England, who are taking the lead in reviewing our application. At their encouragement, we have agreed*** to file CF and NTM at the same time and ***to not restrict our NTM label in any way***. So the application in Europe will include . . . all NTM patients, not simply the refractory patient population that was studied in the [Phase 2 NTM Trial].
>
> So from that perspective ***I think Europe finds this to be an exciting drug. There was open enthusiasm among the co-rapporteurs about the findings that we presented to them. And that, I think, sets us up for as good a chance as we can hope to have for a productive dialogue over the course of the next year with the European authorities***.

141. The statements referenced above in ¶140 were materially false and misleading at the time they were made for the reasons set forth in ¶136. In addition, the statements referenced above in ¶140 that "Europe finds this to be an exciting drug" and "[t]here was open enthusiasm among the co-rapporteurs about the findings that we presented to them" was materially false and misleading at the time it was made because the EMA either was not excited and enthusiastic about the flawed Phase 2 NTM Trial, or Insmed had misled the EMA about the trial's design, execution and results.

142. On November 6, 2014, Insmed issued a press release announcing its financial results for the third quarter, ended September 30, 2014. The press release reiterated that Insmed "plan[ned] to file a . . . [MAA] by year-end 2014 with the . . . [EMA] for ARIKAYCE for the treatment of . . . NTM lung infections . . . ." In the press release, Defendant Lewis commented, in pertinent part, as follows:

> ***We are pleased with the recent regulatory clarity for our NTM program in both Europe*** and the U.S. ***We continue to advance our regulatory filing*** and our preparations for commercialization in Europe . . . .

143. Later that day, Defendants held a conference call with analysts and investors, during which Defendant Lewis commented on the EMA regulatory approval process, in pertinent part, as follows:

> ***We are pleased with our dialogue to date with both the EMA*** and the FDA . . . . ***We now have regulatory clarity with respect to the path towards commercialization*** in both markets.
>
> ***We remain on track to file a . . . MAA with the European Medicines Agency by year end for approval of ARIKACE to treat both patients with NTM lung infections*** and Pseudomonas aeruginosa lung infection in CF patients. ***Following the guidance of our co-rapporteurs, our application will be for all NTM lung infections in patients and not simply those with refractory disease***.
>
> * * *
>
> ***The year to come will be nothing short of transformational for Insmed***.
>
> As we look ahead, ***we're on strong footing and expect to deliver a series of value creating milestones including our EU submission for approval of ARIKACE to treat patients with NTM*** and CF patients with Pseudomonas . . . .

144. During the call, Defendant Lewis responded to an analyst's question about the prospects for EMA approval, in pertinent part, as follows:

> Paul Matteis – Leerink Partners – Analyst:
>
> . . . And then, just one more on the filing in Europe. ***You've talked about the CF and NTM filing being a quote joint MAA. So, from your discussion with the EMA, to what degree do you think they're evaluating both indications separately versus together?*** Because there obviously is some overlap and ***how confident are you that you've met what they need for both CF and NTM and that you'll get the broad label?*** Thanks a lot.
>
> Defendant Lewis:
>
> In this case, I personally attended both of the co-rapporteur meetings, one in Poland with the Polish authorities and the other in England. Those are our two co-rapporteurs coming into this application process.
>
> England is the primary of the two co-rapporteurs and to be very direct, they carry an awful lot of water in Europe when it comes to infectious disease. ***I think we took their guidance, listened to it very carefully, and I would characterize both as being very enthusiastic in their encouragement to us to file for*** both ***NTM*** and CF ***and as I indicated in the comments that the NTM filing should be all NTM patients, not simply those who are refractory***.
>
> * * *

> . . . ***[F]or now, on the guidance of the co-rapporteurs, we feel like we're doing exactly what they've asked us to do***.

145. The statements referenced above in ¶¶142-44 were materially false and misleading at the time they were made for the reasons set forth in ¶136. As a result of the foregoing, Defendants lacked a reasonable basis to state that they were "pleased with the recent regulatory clarity" and the "dialogue to date with . . . the EMA," or to represent that Insmed was "doing exactly what [the EMA] asked" and was "on strong footing . . . to deliver a serious of value creating milestones."

146. Following the press release and conference call, analysts issued favorable reports about Insmed's prospects, with a November 6, 2014 UBS analyst report stating, "We view the EU feedback as a positive and hence we raise our EU sales estimates and probability of success."

147. On December 15, 2014, Insmed issued a press release announcing that the Company had "submitted its . . . [MAA] to the . . . [EMA] and [was] awaiting its validation."

148. On February 27, 2015, Insmed issued a press release stating that Insmed had "[r]eceived validation of the Company's . . . [MAA] to the . . . [EMA] for ARIKAYCE following the approval of the Pediatric Investigation Plan (PIP) by the EMA's Pediatric Committee[.]" In the press release, Defendant Lewis commented that "[t]he validation of our MAA filing with the EMA starts the formal review process for ARIKAYCE . . . ."

149. Reflecting Defendants' previous positive statements and failure to disclose the problems with the Phase 2 NTM Trial, Cowen and Company issued an analyst report the same day characterizing ARIKAYCE's "chance of EMA approval" as "excellent."

150. On March 24, 2015, Insmed held its first annual Analyst and Investor Day in New York, during which an analyst asked about the "major risks" facing Insmed, and Defendant Lewis responded, in pertinent part, as follows:

<u>Unidentified Participant</u>:

> . . . Can you describe to us what you lose sleep over at night, what you think the major risks are for the Company beyond obvious clinical trial risks that may . . . impede you from fulfilling most of your goals?
>
> Defendant Lewis:
>
> . . . ***The thing that gives me the most pause right now*** . . . ***is execution***. I think one of the nice things about this company ***two and a half years ago*** when I had the privilege to talk to the board and to look at the opportunity was, ***I saw an approvable drug, bottom line.*** Its ability to be effective in something like CF, in NTM and potentially in non-CF bronchiectasis. ***We have data*** for all of these areas ***that shows the drug is safe and effective in my judgment. So from that moment to this, it's been an execution story***. And how do we get the company to focus and execute on those most proximate opportunities.
>
> * * *
>
> ***Why do I get comfortable that the clinical risk is digestible?*** . . . It's simply that this is the anti-infective space. It's not . . . particularly sexy but ***it does work***. If you can show that your drug, in a petri dish, kills the bug, and you can deliver it to the site of the infection, you're going to have an impact. And here ***we've seen that already in multiple diseased lung environments –*** CF, non-CF bronch, ***NTM – with a variety of patients from around the world***.
>
> * * *
>
> ***But my enthusiasm flows from the fact that most of the data that would give you insight into whether this is going to work points in the positive direction. So the thing that keeps me up at night is, how do we get efficiently from here to there without losing focus?*** Because I think if we just execute on NTM, everyone in this room in terms of your interests, is going to be very satisfied. And the data for that, and the precedent for that, in terms of other companies and where they end up is very clear. So what keeps me up at night is our ability to execute.

151. The statements referenced above in ¶150 were materially false and misleading at the time they were made because they misrepresented and failed to disclose the following facts, which were known to Defendants or recklessly disregarded by them:

(a) the Phase 2 NTM Trial, upon which Insmed's MAA for ARIKAYCE was based, was deeply flawed in terms of both design and execution, failed to demonstrate the efficacy of

ARIKAYCE, and raised serious concerns about the drug's safety – and thus was highly unlikely to support the approval of ARIKAYCE;

(b) the Phase 2 NTM Trial was not of sufficient duration to provide reliable data on the safety or efficacy of ARIKAYCE – particularly since ARIKAYCE was intended for long-term use;

(c) Insmed was utilizing an unreasonably expansive definition of "culture conversion" – a negative test at a single point in time during the Phase 2 NTM Trial – and the Company's tally of patients who had purportedly achieved "culture conversion" during the trial included patients who tested negative for mycobacteria at the start of the trial. Indeed, the true rate of patients who had experienced culture conversion while receiving ARIKAYCE during the Phase 2 NTM Trial was just 8.5%;

(d) the Phase 2 NTM Trial suffered from execution problems which undermined the reliability of its results. Among other things, residual amounts of ARIKAYCE in patients' sputum samples likely interfered with culture results, leading to false culture conversions;

(e) the EMA was unlikely to approve ARIKAYCE because its product quality was unsatisfactory, which had unknown clinical implications;

(f) the Phase 2 NTM Trial, as well as Insmed's prior clinical trials of ARIKAYCE in cystic fibrosis patients, raised serious concerns about the safety of the drug and demonstrated that ARIKAYCE was an irritant within the airways; and

(g) Insmed had not adequately studied or documented the possible advantages of using liposomal amikacin for inhalation (as opposed to inhaling the amikacin itself), and the clinical evidence supporting any advantage was weak.

152. As a result of the significant flaws in the Phase 2 NTM Trial's design and execution, as well as the trial's failure to demonstrate the safety or efficacy of ARIKAYCE, Defendants lacked a reasonable basis to state that ARIKAYCE was "an approvable drug, bottom line," that Insmed had "data . . . that shows the drug is safe and effective" and "does work," that "the clinical risk is digestible," and that "most of the data that would give you insight into whether this is going to work points in the positive direction."

153. On May 18, 2015, speaking at the UBS Global Healthcare Conference, Defendant Lewis commented on the status of EMA regulatory approval, in pertinent part, as follows:

> As of now, we have filed and . . . been accepted for NTM and CF; that filing has been validated, so now we're [a]waiting 120-day questions, which is the next step in the process.
>
> * * *
>
> ***So, we're on our way. We'll be ready when that response comes***. And when ***ultimately we believe we get approval***, I think we will have laid a very effective and sensible groundwork for a successful commercial launch.

154. During the conference, Defendant Lewis expressed confidence about the prospects for EMA approval, stating, in pertinent part:

> . . . EMA has yet to opine on where they're going to come out. But ***our expectation is that between the [Phase 2 NTM Trial] data set and the promise of the report of [the phase 3 NTM clinical trial] next year, coupled with all of our CF study data, we should be in a good place to secure a label in Europe based on the data sets we currently have in hand***.

155. The statements referenced above in ¶¶153-54 were materially false and misleading at the time they were made for the reasons set forth in ¶151.

156. Following the conference, analysts issued favorable reports reflecting Defendants' positive statements, with a May 18, 2015 UBS analyst report stating: "Between the Day 120

questions, the promise of [Phase 3] data next year, and CF data, management is confident in their ability to secure a label in Europe based on current datasets in hand."

157. On June 24, 2015, speaking at the JMP Securities Life Sciences Conference, Defendant Drechsler commented on the status of the regulatory process in Europe, in pertinent part, as follows:

> I'll spend a couple more minutes on Europe, because we've already started the commercial build out there. We've hired two individuals in Germany and France to lead our organization there. ***We are*** approaching approximately 10 people there that are ***doing a lot of the early work on medical affairs, and interacting with the KOLs [i.e., key opinion leaders], and the other regulatory dialogue that we have going on. So we feel like we're going to take a very prudent approach there, but we are getting in front of it in anticipation of the dialogue we're going to have [] with the EMA coming up***.
>
> *   *   *
>
> ***But we are also very focused on the dialogue with the EMA***, the build out of our European infrastructure.

158. The statements referenced above in ¶157 were materially false and misleading at the time they were made for the reasons set forth in ¶151.

159. On August 6, 2015, Insmed issued a press release announcing its financial results for the second quarter, ended June 30, 2015, and providing a "[b]usiness [u]pdate." The press release announced that "EMA regulatory review [was] progressing," stating that the EMA's "review of the [C]ompany's . . . [MAA] for ARIKAYCE [was] ongoing [and] Insmed ha[d] received the EMA's 120-day questions and ***anticipate[d] responding before the end of 2015***."

160. The press release also announced that "***[p]reliminary long-term data from [the Phase 2 NTM Trial]*** . . . ***support durability of ARIKAYCE treatment effect***," and stated, in pertinent part:

> ***One-year post-ARIKAYCE treatment follow-up data is now available for 14 of 23 patients who achieved culture conversion*** during the 196-day [Phase 2 NTM Trial]. ***Twelve of the 14 patients remained culture negative for NTM at their one-year follow-up visit***. Cultures from the remaining two patients grew in liquid medium

only and not on solid medium, which may represent contamination (false-positive) or a new infection rather than a relapse of the original infecting strain.

161. Later that day, Defendants held a conference call with analysts and investors, during which Defendant Lewis commented on the status of the EMA regulatory process and the EMA's Day 120 Questions, in pertinent part, as follows:

> As we noted in today's release, ***we are preparing our responses to the EMA's 120-day questions. The questions cover a number of topics and overall, I would say that we feel we are well prepared to respond, as there were no surprises with respect to the topics that the Agency asked us to address***.
>
> ***We intend to include the above-mentioned data from the [Phase 2 NTM] study when that clinical study report is completed, as well as other clinical and manufacturing data that we believe will greatly augment the strength of our application. We are on track to accomplish all of this before the end of the calendar year***.

162. During the call, an analyst questioned why the Company would need until the end of 2015 to submit its responses to the EMA's Day 120 Questions, and Defendant Lewis attributed it to the inclusion of one-year follow-up data from the Phase 2 NTM trial, stating, in pertinent part:

> Matt Roden - UBS – Analyst:
>
> . . . First question is on the MAA in Europe. ***Specifically on the 120-day questions. Should we assume that if it's taking sort of several months to address the question***, just trying to understand what's behind that?
>
> Is ***it that there's a lot of heavy lifting involved with responding to the various issues?*** Or is this a matter of waiting out the requisite amount of time that you need to include the updated data that you talked about from the long-term follow-up in the manufacturing? Just trying to understand what's in that. . . .
>
> Defendant Lewis:
>
> . . . ***Yes, the reason for the time is pretty straightforward. We want to include the [clinical study reports ("CSRs")] from the [Phase 2 NTM] study, including the one-year follow-up data, which is fairly recent, as well as the CSR from the 110 open-label extension study, which has only just completed***. So both of those need to be finalized as well as the final data from our P/B batch runs at Althea.

> ***Those are the things that are – the rate-limiting steps in terms of response***. I do not anticipate that they represent a bolus of data that is going to require more time for response.

163. The statements referenced above in ¶¶159-62 were materially false and misleading at the time they were made because they misrepresented and failed to disclose the following facts, which were known to Defendants or recklessly disregarded by them:

(a) the Phase 2 NTM Trial, upon which Insmed's MAA for ARIKAYCE was based, was deeply flawed in terms of both design and execution, failed to demonstrate the efficacy of ARIKAYCE, and raised serious concerns about the drug's safety – and thus was highly unlikely to support the approval of ARIKAYCE;

(b) the Phase 2 NTM Trial was not of sufficient duration to provide reliable data on the safety or efficacy of ARIKAYCE – particularly since ARIKAYCE was intended for long-term use;

(c) Insmed was utilizing an unreasonably expansive definition of "culture conversion" – a negative test at a single point in time during the Phase 2 NTM Trial – and the Company's tally of patients who had purportedly achieved "culture conversion" during the trial included patients who tested negative for mycobacteria at the start of the trial. Indeed, the true rate of patients who had experienced culture conversion while receiving ARIKAYCE during the Phase 2 NTM Trial was just 8.5%;

(d) the Phase 2 NTM Trial suffered from execution problems which undermined the reliability of its results. Among other things, residual amounts of ARIKAYCE in patients' sputum samples likely interfered with culture results, leading to false culture conversions;

(e) the EMA was unlikely to approve ARIKAYCE because its product quality was unsatisfactory, which had unknown clinical implications;

(f) the Phase 2 NTM Trial, as well as Insmed's prior clinical trials of ARIKAYCE in cystic fibrosis patients, raised serious concerns about the safety of the drug and demonstrated that ARIKAYCE was an irritant within the airways;

(g) Insmed had not adequately studied or documented the possible advantages of using liposomal amikacin for inhalation (as opposed to inhaling the amikacin itself), and the clinical evidence supporting any advantage was weak;

(h) the EMA's Day 120 Questions included a Major Objection, whereby the EMA notified Insmed that both the primary and secondary endpoints of the Phase 2 NTM Trial were inappropriate, and that sustained culture conversion "should be the primary endpoint in any study intended to support approval for treatment of NTM";

(i) Insmed required additional time to respond to the EMA's Day 120 Questions not because the Company wanted to include additional follow-up data in its response, but because the EMA had raised a Major Objection to the Phase 2 NTM Trial, and Insmed was scrambling to salvage the study, including by conducting a *post-hoc* analysis of the data utilizing a revised definition of culture conversion – a definition which still did not meet the EMA's criteria; and

(j) after receiving the EMA's Day 120 Questions and Major Objection to the Phase 2 NTM Trial, Insmed revised its MAA to seek approval of ARIKAYCE only for the treatment of a limited subset of NTM patients – MAC-infected adults who had failed first-line therapies.

164. As a result of the foregoing, Defendants lacked a reasonable basis to state that Insmed was "well prepared to respond" to the EMA's Day 120 Questions, or that "there were no surprises with respect to the topics that the [EMA] asked [Insmed] to address." In addition, the statement referenced above in ¶160 that "[p]reliminary long-term data from [the Phase 2 NTM Trial] . . . support[ed] durability of ARIKAYCE treatment effect," with "[t]welve of the 14 patients

remain[ing] culture negative for NTM at their one-year follow-up visit" was materially false and misleading at the time it was made because the Phase 2 NTM Trial did not follow up with patients for efficacy beyond 28 days post-treatment, and the patient follow-up visits at 12 months post-treatment only captured safety data.

165. On September 30, 2015, speaking at the Leerink Partners Rare Disease Roundtable, Defendant Drechsler commented on the status of the EMA approval process, in pertinent part, as follows:

> . . . ***[W]e are in receipt of the day 120 questions for our ARIKAYCE filing with the EMA. As we again mentioned in August, we've asked for a couple of extra months to respond to that, primarily to include some of the interesting follow-up data that we had from our Phase 2 study, in which we saw patients who had converted during that trial, after 12 months off drug, remain negative***. So I would refer folks, again, back to that press release. But we wanted to include that ***now that we have the*** . . . ***clinical study reports, complete there. We will fold that into our response and then submit those later this year***. And then the clock will start again, which would then put us on a timetable to have a decision there, an opinion there, first half, middle part of next year.

166. The statements referenced above in ¶165 were materially false and misleading at the time they were made for the reasons set forth in ¶163. In particular, Insmed required additional time to respond to the EMA's Day 120 Questions not because the Company wanted to include additional follow-up data in its response, but because the EMA had raised a Major Objection to the Phase 2 NTM Trial, and Insmed was scrambling to salvage the study, including by conducting a *post-hoc* analysis of the data utilizing a revised definition of culture conversion – a definition which still did not meet the EMA's criteria. In addition, the statement referenced above in ¶165 that "patients who had converted during [the Phase 2 NTM] trial, after 12 months off drug, remain[ed] negative" was materially false and misleading at the time it was made because the Phase 2 NTM Trial did not follow up with patients for efficacy beyond 28 days post-treatment, and the patient follow-up visits at 12 months post-treatment only captured safety data.

167. On November 6, 2015, Insmed issued a press release announcing its financial results for the third quarter, ended September 30, 2015. The press release stated that "***EMA regulatory review of ARIKAYCE is progressing***," and "***[t]he [C]ompany remains on track to submit its responses to the*** . . . ***[EMA's] 120-day questions before the end of 2015***."

168. Later that day, Defendants held a conference call with analysts and investors, during which Defendant Lewis made positive statements about ARIKAYCE, stating, in pertinent part, as follows:

> ***To date, we have not unearthed anything that is of material concern to us about*** the prevalence, the interest of physicians, or ***the potential clinical impact of ARIKAYCE***. If anything, there is a striking consistency around the world when it comes to the recognition of need, the regulatory engagement, the physician enthusiasm, and the desire of patients for a new therapy. This truly is a global opportunity.

169. During the call, an analyst questioned Defendant Lewis about the timing of the EMA regulatory process, and he responded, in pertinent part, as follows:

> <u>Ritu Baral – Cowen and Company – Analyst</u>:
>
> . . . ***It seems like the responses to the [120]-day questions are taking a bit longer than we sort of expected. Are there any surprises in those questions around the NTM opportunity? Is there any more color you can give as to why this is taking a bit longer than we're used to***.
>
> <u>Defendant Lewis</u>:
>
> . . . To refresh everyone's recollection, ***the [Phase 2 NTM Trial] which forms the basis for the evaluation of our application, had a one-year patient follow-up, which finished up in sort of the third quarter of this year***, give or take.
>
> ***And the CSR [i.e., clinical study report] that is written*** . . . ***at the tail end of the completion of the study, had to be done. Now that we have that one-year data, and it so compelling, it's really critical that we get that final data included in the CSR***.
>
> ***So, we originally went back to the EMA, we requested the six months to be able to submit by the end of the calendar year, so that we could include that CSR from the [Phase 2 NTM Trial]. That's a really important point. It is – everything else is ready to go. That particular CSR has got to be in the dataset***.

170. The statements referenced above in ¶¶167-69 were materially false and misleading at the time they were made for the reasons set forth in ¶163. As a result of the foregoing, Defendants lacked a reasonable basis to state that "[t]o date," they had "not unearthed anything that is of material concern to us about . . . the potential clinical impact of ARIKAYCE." In addition, Insmed's responses to the EMA's Day 120 Questions were taking longer than expected not because the Company wanted to include additional, "compelling" follow-up data in its response, but because the EMA had raised a Major Objection to the Phase 2 NTM Trial, and Insmed was scrambling to salvage the study, including by conducting a *post-hoc* analysis of the data utilizing a revised definition of culture conversion – a definition which still did not meet the EMA's criteria. Finally, the "one-year [follow-up] data" from the Phase 2 NTM Trial was not "compelling" because the Phase 2 NTM Trial did not follow up with patients for efficacy beyond 28 days post-treatment, and the patient follow-up visits at 12 months post-treatment only captured safety data.

171. On December 1, 2015, at the Piper Jaffray Healthcare Conference, an analyst asked about the focus of the EMA's Day 120 Questions, and Defendant Lewis responded, in pertinent part, as follows:

> Joshua Schimmer – Piper Jaffray – Analyst:
>
> Great and then maybe ***focusing on the European filings***, what have you told us publicly in terms of what do we know, what are repertoires, ***what are the questions that are the focus for the agency?***
>
> Defendant Lewis:
>
> . . . But for [sharing] your question about the EU and what we know, our repertoires are England and Poland and we have been in dialogue with the EMA according to the very defined interaction that surround the application process. ***As we've stated previously there's nothing*** . . . ***contained within the questions that was a surprise for us***.
>
> I think the one thing we did want to do and ***there was some question about why we choose to wait until the end of the year to provide our response to 120-day***

> ***questions, that wasn't driven by the question so much as it was our wanting to include the one-year follow-up data from our phase two [NTM] study which was very positive with regard to durability of effect*.**
>
> * * *
>
> ***We feel very comfortable with our responses to their questions which are [all but] complete and ready for submission, so I think we're in as good a position as we can be*.**

172. Also during the conference, Defendant Lewis assured investors that Insmed's laboratory processes ensured that residual amounts of ARIKAYCE in patients' sputum samples had not skewed culture conversion results, stating, in pertinent part:

> . . . ***I think as you know many people were asking the question, well if you're inhaling the drug and then you are expectorating sputum, how do you know you're not just putting the drug back into the dish and causing it to culture convert and there are host of ways to answer that because we have look at this very thoroughly***.
>
> The best evidence of course is the durability of effect off drug for long periods of time, but more to the point . . . where there is concentration of the drug in the sputum when it's expectorated, ***there is a process where it is diluted and then [spun] in the centrifuge and the only thing that remains is non-drug sample that is examined for the presence of the underlying colonies***.
>
> ***So, it's a very thorough process, it's very standardized and that ensure that there is no corruption of the sample***.

173. The statements referenced above in ¶¶171-72 were materially false and misleading at the time they were made for the reasons set forth in ¶163. As a result of the foregoing, Defendants lacked a reasonable basis to state that there was "nothing . . . contained within the [Day 120] questions that was a surprise for us." In addition, "the one-year follow-up data from" the Phase 2 NTM Trial was not "very positive with regard to durability of effect" because the Phase 2 NTM Trial did not follow up with patients for efficacy beyond 28 days post-treatment, and the patient follow-up visits at 12 months post-treatment only captured safety data. Finally, Insmed did not have "a very thorough process" to "ensure that there [was] no corruption of the sample" because residual

amounts of ARIKAYCE in patients' sputum samples likely interfered with culture results, leading to false culture conversions.

174. On January 13, 2016, speaking at the JP Morgan Healthcare Conference, Defendant Lewis confirmed that Insmed had submitted its responses to the EMA's Day 120 questions, and commented on the regulatory process, in pertinent part, as follows:

> Those of you who follow the Company know we have already filed in the EU and are currently awaiting the EMA's decision, which we expect within the first half of this year. We committed that we would submit our responses to their 120-day questions by the end of last year, and we did that. ***And we included in that response all of this new data that is the one-year off-drug information that I mentioned earlier. We think that is particularly compelling, because it answers the question of durability***.
>
> * * *
>
> ***So with regard to the EU filing***, . . . we're going to hear in the first half of this year . . . . The clock now tick[s] and we wait for their 180-day responses. ***It's not atypical when those come in that there may be additional questions***.
>
> ***I expect that that will be the case specifically for us, because we've just added a bunch of new and very exciting data to our 120-day responses, which is the one-year follow-up that showed durable culture conversion. And no doubt there will be some questions about that. I don't anticipate that those will take long to clear up***. And on the heels of that, we'll obviously hear from the EMA on their final decision.

175. The statements referenced above in ¶174 were materially false and misleading at the time they were made for the reasons set forth in ¶163. In addition, the one-year follow-up data from the Phase 2 NTM Trial was not "particularly compelling" or "very exciting" and it did not "answer[] the question of durability" or "show[] durable culture conversion" because the Phase 2 NTM Trial did not follow up with patients for efficacy beyond 28 days post-treatment, and the patient follow-up visits at 12 months post-treatment only captured safety data.

176. On June 8, 2016, after the close of the market, Insmed stunned investors by announcing that it had "***withdrawn its*** . . . ***[MAA] from the*** . . . ***[EMA] for ARIKAYCE™ for the treatment of*** . . . ***[NTM] lung disease***." According to the Company's press release:

> The MAA filing was based on data from the company's completed phase 2 study. ***During the May 2016 Committee for Medicinal Products for Human Use (CHMP) meeting, the CHMP indicated that the phase 2 study did not provide a sufficient amount of evidence to support an approval***. Insmed intends to resubmit its MAA when clinical data from its ongoing global phase 3 study are available.

177. In response to the news that Insmed was withdrawing its application for regulatory approval of ARIKAYCE by the EMA, the price of Insmed common stock fell 8.24%, on heavy trading volume, from a closing price of $12.01 per share on June 8, 2016, to close at $11.02 per share on June 9, 2016. The price of Insmed common stock continued to decline over the next three trading days, as the market digested the significance of Insmed's MAA withdrawal, closing at $10.07 per share on June 14, 2016 – a total decline of more than 16%.

178. Summarizing the import of Insmed's withdrawal of its MAA, a June 10, 2016 Cowen and Company analyst report stated that "[w]e are pushing back EU Arikayce revenues to 2019 . . . and removing our price target," and noted that "there is currently not insignificant frustration with [Insmed management.]"

**Additional Scienter Allegations**

179. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of the Company or in their own name during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Insmed, their control over, and/or receipt and/or modification of Insmed's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential

proprietary information concerning Insmed, were active and culpable participants in the fraudulent scheme alleged herein.

180. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

181. The Individual Defendants, because of their positions with Insmed, controlled the contents of the Company's public statements during the Class Period. The Individual Defendants were provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations that were being made were false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of Insmed's corporate statements and is therefore responsible and liable for the misrepresentations contained therein.

182. Defendants knew, or recklessly disregarded, that the Phase 2 NTM Trial was fundamentally flawed, in both design and execution, had failed to demonstrate the efficacy of ARIKAYCE, and had raised serious concerns about the drug's safety – and thus was highly unlikely to support the approval of ARIKAYCE.

183. The fraud alleged herein relates to the core business of Insmed, so knowledge of the fraud may be imputed to Defendants. Indeed, Defendant Lewis publicly acknowledged his close

involvement in the MAA process, pursuant to which the EMA was analyzing the results of the Phase 2 NTM Trial. For example, Defendant Lewis stated during a November 6, 2014 conference call that he "personally attended both of the co-rapporteur meetings, one in Poland . . . and the other in England." Given Defendants' knowledge of the flawed nature of the Phase 2 NTM Trial, the positive statements detailed above, made contemporaneously with that knowledge, were false and/or misleading.

184. The sudden resignation of Dr. Renu Gupta, the chief architect and primary investigator of the Phase 2 NTM Trial, on April 2, 2014 – just one week after Insmed announced the results of the trial – provides additional circumstantial evidence that Defendants were aware of the significant problems with the Phase 2 NTM Trial.

185. Defendants were motivated to conceal the design and execution flaws of the Phase 2 NTM Trial, and to misrepresent its safety and efficacy findings, because a positive perception of ARIKAYCE was critically important to Insmed, since the Company's path to profitability was dependent upon ARIKAYCE. During the Class Period, ARIKAYCE was Insmed's sole drug candidate undergoing clinical trials, and thus, its only hope for near-term profitability. If approved, ARIKAYCE would be the only drug approved for the treatment of NTM lung disease, and according to analysts, had the potential to generate upwards of $600 million in revenues per year in the U.S. and Europe.

186. Defendants were further motivated to conceal the problems with the Phase 2 NTM Trial in order to enroll patients in the Phase 3 trial that Insmed needed to conduct before it could receive FDA approval of ARIKAYCE in the United States (the "Phase 3 NTM Trial"). Indeed, the United States was a larger and far more lucrative market for ARIKAYCE than Europe, and the FDA had informed Insmed that a Phase 3 clinical trial would be required before the FDA would consider

approving ARIKAYCE for the treatment of NTM. As Defendant Lewis stated in August 2015, completing enrollment in the Phase 3 NTM Trial was Insmed's "top priority for the year."

187. Publicly calling into question the safety and efficacy of ARIKAYCE was likely to slow enrollment in the Phase 3 NTM Trial. Doctors are more likely to encourage their patients to participate in a trial of a drug that is considered safe and efficacious, and patients are more likely to accept such a recommendation. Accordingly, the longer Defendants could maintain the illusion of positive Phase 2 NTM Trial results, the faster the Phase 3 NTM Trial could be enrolled and, Defendants hoped, generate positive results. Likewise, any public acknowledgement of the design and execution problems with the Phase 2 NTM Trial would call into question Insmed's ability to successfully conduct clinical trials.

188. Defendants knew from their experience in the pharmaceutical industry that once the problems with the Phase 2 NTM Trial came to light, enrollment in the Phase 3 NTM Trial would dramatically slow down. Indeed, Insmed was ultimately unable to complete patient enrollment in its Phase 3 NTM trial until November 2016, nearly a year after the Company's initial projection that the trial would be fully enrolled by the end of 2015.

189. Finally, Defendants were motivated to conceal the problems with the Phase 2 NTM Trial in order to capitalize on Insmed's artificially inflated stock price by raising approximately $331 million during the Class Period from the unsuspecting public, via two secondary offerings of the Company's common stock, as depicted in the following chart:

| **Offering Closing Date** | **Offering Documents** | **Offering Description** | **Net Proceeds** |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 8/18/2014 | (1) Form S-3 Shelf Registration Statement filed on 5/30/2014; (2) Form 424B Prospectus filed on 8/11/2014; (3) Form 424B Prospectus filed on 8/13/2014 | 10,235,000 shares sold to the public at $11.25 per share | $108 million |
| 4/6/2015 | (1) Form S-3 Shelf Registration Statement filed on 5/30/2014; (2) Form 424B Prospectus filed on 3/30/2015; (3) Form 424B Prospectus filed on 3/31/2015 | 11.5 million shares sold to the public at $20.65 per share | $223 million |
| | | | **Total: $331 million** |

190. Defendants intended these offerings to provide Insmed with the funds to properly design and execute the Phase 3 NTM Trial – in contrast to the Phase 2 NTM Trial, for which resource constraints had led Insmed to rush the study, take shortcuts, and simply hope for the best. Indeed, when Insmed announced its plans to conduct the Phase 3 NTM Trial on November 6, 2014 (with the proceeds from the August 2014 secondary offering in-hand), Defendant Lewis told investors that "this Company and what we're bringing to bear is fundamentally in a different place than it was when the last study was done. The last study really was quite severely resource constrained . . . ."

**Loss Causation/Economic Loss**

191. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Insmed common stock and operated as a fraud or deceit on Class Period purchasers of Insmed common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Insmed common stock fell precipitously as the prior artificial inflation dissipated. As a

result of their purchases of Insmed common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e*., damages, under the federal securities laws.

192. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Insmed's business and prospects. Defendants' false and misleading statements and omissions had the intended effect and caused Insmed common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $27.54 per share on August 5, 2015.

193. On June 8, 2016, after the close of the market, Insmed stunned investors by announcing that it had "withdrawn its . . . [MAA] from the . . . [EMA] for ARIKAYCE™ for the treatment of . . . [NTM] lung disease," after the CHMP had "indicated that the phase 2 study did not provide a sufficient amount of evidence to support an approval." In response, the price of Insmed common stock fell 8.24%, on heavy trading volume, from a closing price of $12.01 per share on June 8, 2016, to close at $11.02 per share on June 9, 2016. The price of Insmed common stock continued to decline over the next three trading days, as the market digested the significance of Insmed's MAA withdrawal, closing at $10.07 per share on June 14, 2016 – a total decline of more than 16%.

194. The precipitous decline in the price of Insmed common stock was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the declines in the price of Insmed common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e*., damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Insmed common

stock and the subsequent significant decline in the value of Insmed common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**
**and *Affiliated Ute* Doctrine**

195. Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's common stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e) Plaintiff and the other members of the Class purchased Insmed common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

196. At all relevant times, the market for Insmed common stock was an efficient market for the following reasons, among others:

(a) Insmed common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) as a regulated issuer, Insmed filed periodic public reports with the SEC and the NASDAQ;

(c) Insmed regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Insmed was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

197. As a result of the foregoing, the market for Insmed common stock promptly digested current information regarding Insmed from all publicly available sources and reflected such information in the prices of Insmed's common stock. Under these circumstances, all purchasers of Insmed common stock during the Class Period suffered similar injury through their purchase of Insmed common stock at artificially inflated prices and a presumption of reliance applies.

198. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Insmed's business and prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

199. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

**No Safe Harbor**

200. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein. Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Insmed who knew that those statements were false when made.

**COUNT IV**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Insmed, Lewis and Drechsler**

201. Plaintiff incorporates herein ¶¶1-81 and ¶¶125-200 by reference.

202. In this Count, the term "Defendants" refers only to Defendants Insmed, Lewis and Drechsler.

203. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

204. Defendants violated §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

205. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Insmed common stock. Plaintiff and the Class would not have purchased Insmed common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

206. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Insmed common stock during the Class Period.

**COUNT V**

**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

207. Plaintiff incorporates herein ¶¶1-81 and ¶¶125-206 by reference.

208. The Individual Defendants acted as controlling persons of Insmed within the meaning of §20(a) of the Exchange Act, as alleged herein. By reason of their high-level positions with the Company, and their ownership of Insmed common stock, their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and materially misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control (and did influence and control),

directly or indirectly, the decision-making of the Company, and caused Insmed to engage in the wrongful conduct complained of herein, including the dissemination of the various statements which Lead Plaintiff contends are false and misleading. The Individual Defendants were provided with or had access to: Company reports, press releases, public filings and other information and statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

209. As set forth above, Insmed and the Individual Defendants violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. Moreover, by virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for Insmed's §10(b) and Rule 10b-5 violations. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as Class representative, and designating Lead Counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

C. With respect to Count IV, ordering that the Secondary Offering be rescinded or awarding a rescissory measure of damages;

D. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. Awarding such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: December 15, 2016

Respectfully submitted,

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
ERIN W. BOARDMAN

By: *s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

*Lead Counsel for Plaintiff*

James E. Cecchi
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

*Liaison Counsel for Plaintiff*

CERTIFICATE OF SERVICE

I, Samuel H. Rudman, hereby certify that on December 15, 2016, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Samuel H. Rudman*
SAMUEL H. RUDMAN